Filed 4/24/25  In re Mario S. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re MARIO S., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | |
| Plaintiff and Respondent, | E084518 |
| v. | (Super.Ct.No. RIJ2000392) |
| MARIO S., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mark E. Petersen, Judge.
Affirmed.

Paul R. Kraus, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

1

The People filed a juvenile wardship petition against Mario S. alleging that he committed one count of murder. Mario appeals from the juvenile court's order transferring him to adult criminal court under Welfare and Institutions Code section 707. (Unlabeled statutory references are to this code.) He argues that the record does not contain substantial evidence supporting the transfer order, particularly because there is no evidence of the rehabilitative services offered to Mario during his two years of juvenile confinement in this case. We affirm.

LEGAL FRAMEWORK

"Section 707 sets forth the procedures for transferring a minor from juvenile court to criminal court. It provides that whenever a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move 'to transfer the minor from juvenile court to a court of criminal jurisdiction.' (§ 707, subd. (a)(1).) The prosecution bears the burden of proving that the minor should be transferred. (Cal. Rules of Court, rule 5.770(a).)" (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164 (*Miguel R.*).)

After the People move to transfer the minor, "the juvenile court shall order the probation officer to submit a report on the behavioral patterns and social history of the minor." (§ 707, subd. (a)(1).) "Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction. In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor

2

is not amenable to rehabilitation while under the jurisdiction of the juvenile court."

(§ 707, subd. (a)(3).)

The court must consider five criteria when deciding whether the minor is amenable to rehabilitation under juvenile court jurisdiction. (§ 707, subd. (a)(3)(A)-(E).) "Those criteria are (1) 'the degree of criminal sophistication exhibited by the minor' (§ 707, subd. (a)(3)(A)(i)), (2) '[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction' (§ 707(a)(3)(B)(i)), (3) '[t]he minor's previous delinquent history' (§ 707, subd. (a)(3)(C)(i)), (4) '[s]uccess of previous attempts by the juvenile court to rehabilitate the minor' (§ 707, subd. (a)(3)(D)(i)), and (5) '[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor' (§ 707, subd.(a)(3)(E)(i)). The statute sets forth a nonexhaustive list of relevant factors for the court to consider with respect to each of the five criteria. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)"[1] (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164.)

---

[1] The listed relevant factors for the five criteria are: "the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication" (§ 707, subd. (a)(3)(A)(ii) [the degree of criminal sophistication]); "the minor's potential to grow and mature" (*id.*, subd. (a)(3)(B)(ii) [possibility of rehabilitation within the time remaining of juvenile court jurisdiction]); "the seriousness of the minor's previous delinquent history and the effect of the minor's

*[footnote continued on next page]*

BACKGROUND

I.   *The alleged offense*[2]

In June 2020, 17-year-old Mario exchanged social media messages with 18-year-old Angel Lopez, the victim. Mario arranged a meeting to buy vape products from Lopez. On the day of the meeting, Mario sent a message to an unknown individual and asked whether that individual knew Lopez. Mario also asked the unknown individual if he "'got [Lopez] yet,'" because Mario "wanted to," and Mario said that he needed help to "remove the box." Lopez stored his vape products in a box.

Mario sent an address to Lopez and told him to message Mario when he arrived there. Lopez sent a message to Mario at roughly 5:35 p.m., stating, "'here.'" At approximately 5:37 p.m., officers responded to the scene of a reported attempted homicide and found Lopez alone in his car. He was bleeding from gunshot wounds on the right side of his body. He briefly described the shooter before losing consciousness, and he died later at the hospital. Lopez had three gunshot wounds that were caused by one bullet. Officers found five nine-millimeter bullet casings at the scene. Lopez's car

family and community environment and childhood trauma on the minor's previous delinquent behavior" (*id.*, subd. (a)(3)(C)(ii) [previous delinquent history]); "the adequacy of the services previously provided to address the minor's needs" (*id.*, subd. (a)(3)(D)(ii) [previous juvenile court attempts to rehabilitate]); and "the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development" (*id.*, subd. (a)(3)(E)(ii) [circumstances and gravity of the alleged offense]).

[2]   We take the facts of the alleged offense from the probation report.

4

had two bullet holes near the rear license plate and one bullet hole in the center console gear shifter.

Multiple witnesses saw two males at the scene of the shooting. One of those males, who was later identified as Mario, pointed a gun at Lopez's car and fired multiple shots as Lopez attempted to drive away. In addition, surveillance video from a neighborhood resident showed Mario and the other male walking toward the crime scene. Lopez's car drove by shortly afterward, and multiple "'popping'" sounds could be heard on the video.

Mario lived with his grandmother and two of her other grandsons on Evans Street. Documented Casa Blanca Rifa gang members lived at the residence, and officers were electronically surveilling the residence on the day of the shooting. That surveillance video showed Mario and another male arriving at the residence at about 5:37 p.m. that day. At roughly 6:01 p.m., Mario's cousin (a Casa Blanca Rifa gang member) left the residence and drove to the area of the shooting; he appeared to be "trying to see what was going on."

Officers obtained a search warrant for Mario's residence. They found a firearm silencer, a 33-round magazine containing 26 nine-millimeter rounds, a handgun spring, and a gun box in Mario's bedroom. Mario's cell phone contained multiple photos of him with firearms, including some firearms that had an extended magazine and a silencer like those found in his room. He was arrested in July 2020.

5

II.    *The petition and the probation report*

The People filed the original juvenile wardship petition against Mario in July 2020.  In July 2021, the juvenile court ordered the matter transferred to the criminal court.  That court transferred the matter back to the juvenile court to address the amendments to section 707 under Assembly Bill No. 2361 (2021-2022 Reg. Sess.), effective January 1, 2023.

The People filed a superseding juvenile wardship petition in October 2023.  The petition alleged that Mario committed one count of murder.  (Pen. Code, § 187, subd. (a).)  It further alleged that he committed the murder for the benefit of, at the direction of, or in association with a criminal street gang (*id.*, § 186.22, subd. (b)) and that he personally and intentionally discharged a firearm, causing great bodily injury or death (*id.*, § 12022.53, subd. (d)).

The People immediately moved to transfer Mario to criminal court.  In January 2024, the probation department submitted a report under subdivision (a)(1) of section 707 recommending transfer.  Mario was 21 years old by that time.  The probation report described Mario's social history and included statements from Mario and his mother.  The probation officer contacted Mario's father, but he declined to be interviewed.

Mario denied any affiliation or gang involvement.  But he had tagged his room and notebook with "CBR" and "Casa Blanca Riva."  While in custody, he had also tattooed "Evans" on his hand and a house on his thigh.  He told the probation officer that his uncle, who was a member of the Casa Blanca Rifa gang, may have tagged his

6

notebook, and he did not recall tagging his room. Mario said that the house tattoo had no significant meaning and that the Evans tattoo signified the street on which he grew up. Mario's mother reported that Mario was not involved with a gang. She drove him to school because "'Evans Street and Fern Street' did not get along." Mario could have been assaulted by Fern Street just for living on Evans Street.

Mario attended Arlington High School before he was detained in juvenile hall. He had an individualized education program for a "specific learning disability with attention processing deficits." (Capitalization omitted.) Mario enjoyed the social aspect of school but did not like doing school work, and his grades suffered. Mario's mother reported that he typically behaved well at Arlington, although he was suspended three times. The first suspension was for possessing fireworks. The school suspended him again for a two-on-one physical altercation when he helped his friend fight another student. And the third suspension was for possessing a knife. Mario said that he had unintentionally left the knife in his pocket after a camping trip.

Mario's mother transferred him to a military school, because she felt that the assistant principal at Arlington had labeled Mario a gang member. She also moved to a different neighborhood so that he could "have a second chance away from" his peers, who were negative influences, but he was allowed to return to the area to visit family. Mario was involved in choir and orchestra at the military school. He enjoyed video games, social media, amusement parks, and socializing with his friends.

7

Mario reported that he received more one-on-one attention in juvenile hall and improved his grades. He graduated from high school in 2021 with a 2.06 grade point average. In his last year, he earned mostly A's and B's and attended most of his classes. He had started college courses in marketing before the court transferred him to criminal court in 2021.

Mario reported that he first drank alcohol at age seven. He began smoking marijuana at age 15 and using cocaine at age 16. Before his arrest, he smoked marijuana daily, typically drank at parties, and used cocaine whenever his friends provided it. Mario last smoked marijuana and used cocaine the day before his arrest. He said that he last drank alcohol the day before his arrest, but deputies found a homemade alcoholic beverage in his cell in October 2022. Mario was "hesitant" to say that he would comply with probation conditions or a case plan without seeing any such conditions or plan first. He wanted to be able to consume alcohol and smoke marijuana upon his release.

As to mental health history, Mario received counseling for three weeks in middle school; he was feeling sad and depressed about his parents' fighting and separation. He saw a therapist weekly in juvenile hall to address anger management. He was prescribed Depakote as a mood stimulator and Hydroxyzine to help him sleep.

Mario had one prior referral to the probation department. In 2018, he was referred to the department for allegedly fighting in a public place. The referral was closed at intake, and no juvenile wardship petition was filed. In the present case, he generally

8

exhibited satisfactory behavior in juvenile hall. But at times Mario was disrespectful and required multiple redirections.

Mario was involved in several incidents while he was in the custody of the sheriff's department in 2023. In March, he participated in an 11-on-one altercation when he helped other jail inmates remove a person from their pod. In September, he was involved in a three-on-one altercation when another inmate again asked for his help. And in December, he refused to follow staff directives and attempted to strike deputies. Mario acknowledged that some of his current friends were bad influences in that he "'gets dragged into their problems'" and delinquent behavior. He was willing to help them in order to gain their favor and in exchange for help when he needed it.

The probation report noted that if Mario remained in juvenile court and was committed to a secure youth treatment facility, then he would participate in "evidence-based programming, such as: Aggression Replacement Training, Moral Recognition Therapy, Seeking Safety, Forward Thinking, Thinking for a Change, Social Awareness Programming, gender-specific programming, Individual Therapy, Group Therapy, Family Therapy, Psychiatric Services, and Trauma Focused-Cognitive Behavioral Therapy."

Mario denied that he suffered any physical or emotional abuse. His mother said that she had reported Mario's father to the child welfare agency in 2013. Mario's father was arguing with his girlfriend, and they left Mario and Mario's half sibling alone on the street. The Riverside County Department of Public Social Services received a referral

9

concerning Mario in 2016. The referral alleged general neglect by his father, and the agency closed the referral as unfounded.

Mario reported that he is close to his mother, but they argued often about school, his substance abuse, and her boyfriend. He did not get along with his mother's boyfriend. Mario's mother said that their relationship was strained before his arrest, possibly because of his marijuana use. Mario did not have a good relationship with his father before this case began. Their relationship had improved since Mario had been in custody; his father visited him, and he was able to talk to his father about problems.

The probation officer recommended transfer to criminal court on the basis of four of the relevant statutory criteria: Mario's degree of criminal sophistication, whether he could be rehabilitated before the expiration of juvenile court jurisdiction, his delinquency history, and the circumstances and gravity of the alleged offense. (§ 707, subd. (a)(3)(A)-(C), (E).) With respect to the remaining statutory criterion—success of previous attempts by the juvenile court to rehabilitate Mario—the probation officer opined that the criterion did not support transfer. (§ 707, subd. (a)(3)(D).) The officer noted that there was no evidence of any previous attempts to rehabilitate Mario, given that the sole prior referral to the probation department was closed at intake.

III. *The transfer hearing and the court's ruling*

No witnesses testified at the contested transfer hearing in July 2024. The court considered the probation report and the parties' trial briefs regarding transfer.

Mario's brief argued that he was amenable to rehabilitation while under the jurisdiction of the juvenile court. As to his degree of criminal sophistication, Mario's counsel argued that at 17 years old, Mario was not "legally old enough to know the difference between right and wrong." And although Mario planned a robbery and carried a weapon, there was no indication that he planned to use the gun. Counsel also argued that there was adequate time to rehabilitate Mario before juvenile court jurisdiction expired, given his low level of criminal sophistication. Regarding prior attempts by the juvenile court to rehabilitate Mario, counsel agreed with the probation officer that there were no prior attempts. And concerning the circumstances and gravity of the alleged offense, counsel characterized Lopez's death as "arguably . . . unplanned." Counsel asserted that while the death was "devastating," that alone did not carry the People's burden on the transfer motion. Mario's brief did not expressly address the remaining factor, his delinquency history.

At the contested hearing, Mario's counsel reiterated two points. First, Mario was a minor and had "all of the attributes that go with being a minor." Second, the victim's death was unfortunate, but there was insufficient evidence that "the plan all along" was to kill him.

The juvenile court took the matter under submission and set a hearing in August 2024 to issue its ruling. On the scheduled date, the court issued a written statement of decision granting the transfer motion. It also orally summarized the ruling at the hearing and memorialized the on-the-record ruling in a minute order from that hearing.

11

The court found that the People had shown by clear and convincing evidence that Mario was not amenable to rehabilitation while under the jurisdiction of the juvenile court. Concerning the degree of criminal sophistication exhibited by Mario, the court found the criterion weighed in favor of transfer. The court noted that despite Mario's age, he was able to procure a gun and paraphernalia like a silencer and a high-capacity magazine. In addition, the offense was "not a crime of opportunity" but was a "planned event" for which Mario armed himself. The evidence showed that Mario "knew what he was doing, participated willingly, had knowledge of weapons and firearms," and "chose to engage in a very risky and dangerous event involving the use of a firearm in a public place."

With respect to whether Mario could be rehabilitated before juvenile court jurisdiction expired, the court found the criterion also supported transfer. The court noted that Mario exhibited poor behavior in custody. He was in several altercations, attempted to strike staff, and was caught with the homemade alcoholic beverage. He indicated that he did not intend to comply with certain conditions if he were released on probation. Mario would be 22 years old in less than one month, so the juvenile court would have roughly three years to provide rehabilitative services. There were "many areas" in which Mario needed rehabilitative services, and the court concluded that there was insufficient time for those services to be successful "such that [Mario] would benefit and become law abiding."

12

The court concluded that Mario's delinquency history also supported transfer. The court observed that Mario had one prior referral for fighting in public but also suspensions at school for fighting and possessing a knife. He also had a history of substance abuse and associated with documented gang members who were family.

As to success of previous attempts to rehabilitate Mario, the court determined that there was no evidence of such attempts, so the criterion did not support transfer. Lastly, regarding the circumstances and gravity of the alleged offense, the court determined that the criterion weighed in favor of transfer. The court noted that the offense was serious, violent, deliberate, and callous in nature. Mario lured the victim to a specific location, and when the victim attempted to flee, Mario shot at him multiple times. Mario showed a complete lack of regard for the safety of the victim and any other community members in the area.

### STANDARD OF REVIEW

"We review the juvenile court's ruling on a transfer motion for abuse of discretion." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.) "'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.'" (*Ibid.*) "The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence." (*Ibid.*)

13

"Likewise, we review for substantial evidence the juvenile court's ultimate finding 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' [Citation.] Because the juvenile court must make that finding by clear and convincing evidence, we 'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165, quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) "In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings." (*Miguel R.*, at p. 165.)

## DISCUSSION

Mario argues that the record does not contain substantial evidence supporting the finding that he is not amenable to rehabilitation while under juvenile court jurisdiction. In particular, he asserts that there was no evidence of services offered to him in juvenile confinement and no evidence of his willingness to participate in those services. He contends that absent such evidence, the court's finding that he could not be rehabilitated before the expiration of juvenile court jurisdiction is unsupported. The argument lacks merit.

The record is clear that the court considered the absence of evidence about the services offered to Mario during his period of juvenile confinement. One factor that the court considers under the fourth criterion—the success of previous attempts to rehabilitate the minor—is "the adequacy of the services previously provided to address

14

the minor's needs." (§ 707, subd. (a)(3)(D)(ii).)  The court found that the fourth criterion did not support transfer because there was no evidence regarding previous services.

But that lack of evidence does not show that the court erred with respect to the second criterion, whether Mario could be rehabilitated before the expiration of juvenile court jurisdiction.  The court shall consider "any relevant factor" under that criterion, "including, but not limited to, the minor's potential to grow and mature." (§ 707, subd. (a)(3)(B)(ii).)  Even if there was no evidence of services that Mario had received, the court considered relevant factors.  Mario was seeing a therapist for anger management. He was involved in numerous fights starting in high school.  His violent behavior had escalated to a lethal shooting when the apparent robbery victim tried to flee from him. He continued to engage in altercations in custody.  And the evidence showed that he had a substance abuse problem:  He began drinking at age seven and using marijuana at age 15, and he used marijuana daily for years.  His mother thought that the strain in their relationship might be due to his marijuana use.  He had been caught with homemade alcohol in his cell, and he wanted to continue drinking alcohol and smoking marijuana if he were released on probation.  Mario was nearly 22 years old, so there were roughly three years of juvenile court jurisdiction remaining.  All of that evidence constitutes substantial evidence supporting the court's finding that there was insufficient time "to provide the minor with successful rehabilitative services such that the minor would benefit and become law abiding."

15

Moreover, the lack of evidence regarding services during Mario's juvenile confinement does not show that the court erred with respect to the ultimate determination of amenability. The court's ultimate determination regarding amenability to rehabilitation "concerns a global assessment of the minor's suitability to rehabilitation within the juvenile court system." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 167.) In making its ultimate determination, the court must consider all five criteria under subdivision (a)(3) of section 707, and "the statute does not require that any of those criteria be afforded any greater weight than any other." (*Miguel R.*, at p. 167.) Instead, the "'court has the discretion to conclude that one or more of the five [criteria] predominate so as to determine the result, even though some or all of the other [criteria] might point to a different result.'" (*Id.* at p. 168.)

Accordingly, the lack of evidence on one factor (services previously provided to address the minor's needs) in evaluating one criterion (success of previous attempts to rehabilitate the minor) is not dispositive. The court had discretion to find Mario was not amenable to rehabilitation in the juvenile court on the basis of the other criteria. And Mario does not challenge the sufficiency of the evidence underlying the court's findings with respect to his delinquency history, his criminal sophistication, or the circumstances and gravity of the alleged offense. The latter two criteria in particular weighed heavily in favor of transfer.

In sum, Mario fails to show that the absence of evidence of services offered to him in juvenile confinement renders the court's ruling erroneous. Other evidence in the

16

record amply supported the court's finding that he was not amenable to rehabilitation in the juvenile court.

## DISPOSITION

The order transferring Mario to criminal court is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ

J.

We concur:

MILLER

     Acting P. J.

CODRINGTON

     J.